**Peter SUDARSKY and Nominee Trading Corporation d/b/a 225–227 East 52nd Street Associates, Plaintiffs,**

**v.**

**The CITY OF NEW YORK, the New York City Planning Commission, the New York City Department of City Planning, the New York City Transit Authority and the Metropolitan Transportation Authority, Defendants.**

**No. 89 Civ. 5150 (RJW).**

United States District Court, S.D. New York.

Nov. 22, 1991.

Solin & Breindel P.C., New York City, (Victor P. Muskin, of counsel), for plaintiffs.

O. Peter Sherwood, Corp. Counsel for the City of New York, Jane Gordon, Asst. Corp. Counsel, New York City, (Gabriel Taussig, Albert Fredericks, of counsel), for defendants City of New York, the New

York City Planning Com'n and the New York City Dept. of City Planning.

Albert C. Cosenza, Vice President and General Counsel, New York City Transit Authority, Brooklyn, N.Y. (M. Margaret Terry, Mario Fristachi, of counsel), for defendants the New York City Transit Authority and the Metropolitan Transit Authority.

OPINION

WARD, District Judge.

Defendants City of New York (the "City"), New York City Planning Commission ("CPC"), New York City Department of City Planning ("DCP"), New York City Transit Authority ("TA"), and Metropolitan Transportation Authority ("MTA") move, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint, with costs, including reasonable attorneys' fees. Plaintiffs Peter Sudarsky ("Sudarsky") and Nominee Trading Corporation ("NTC") d/b/a 225–227 East 52nd Street Associates cross-move, pursuant to Rule 56, Fed.R.Civ.P., for partial summary judgment as to liability. For the reasons that follow, defendants' motion for summary judgment is granted and plaintiffs' cross-motion for partial summary judgment is denied.

BACKGROUND

This action, brought pursuant to 42 U.S.C. § 1983, arises out of a dispute concerning the procedures used by defendants in reviewing plaintiffs' development project. These procedures had the ultimate effect of preventing plaintiffs from developing their property in the manner they desired. The facts are undisputed, except as noted.

At all times relevant to this action, Sudarsky and NTC were the sole partners of 225–227 East 52nd Street Associates (the "Partnership"), a New York partnership engaged in the real estate business. The

Partnership is owned 99% by Sudarsky and 1% by NTC. The CPC is a department of the City government established pursuant to the New York City Charter (the "City Charter") and Administrative Code.[1] The CPC's responsibilities include, among other things, the regulation of land use in conformity with applicable zoning rules and the preparation of recommendations for changes in zoning. The DCP is a division of the CPC. The TA is a public benefit corporation organized pursuant to N.Y.Pub.Auth.Law §§ 1201 et seq. for the purpose of operating transit facilities within the City. The TA's responsibilities include, among other things, the operation, maintenance and planning of subway stations and access thereto. The MTA is a public authority organized and existing pursuant to N.Y.Pub.Auth.Law §§ 1260 et seq. The MTA's responsibilities include, among other things, the development of commuter transportation facilities within the City of New York and the counties of Dutchess, Nassau, Orange, Putnam, Suffolk and Westchester.

Because Sudarsky's claims concern the process of obtaining the requisite approvals for a real estate development project in the City, some understanding of that approval process is necessary to an analysis of his claims. Therefore, a brief description of the relevant City regulations follows.

*The Zoning Resolution*

The New York City Zoning Resolution (the "Zoning Resolution") is established under section 200.a.1 of the City Charter. The New York City Department of Buildings (the "Buildings Department") is primarily responsible for enforcing and administering the Zoning Resolution. Zoning Resolution § 71–00. Appeals from administrative interpretations of the Zoning Resolution are heard by the Board of Standards and Appeals. *Id.* at § 72–01.

Changes to the Zoning Resolution are initiated by the CPC, either on its own, or upon application. N.Y. City Charter

1. All references herein to the New York City Charter are to the former Charter in effect at the time of the events giving rise to the instant lawsuit. That Charter has now been superseded, pursuant to the changes to the Charter proposed by the New York City Charter Revision Commission and adopted by the voters of the City in the election of November 7, 1989.

§ 200.a. Before adopting a resolution recommending a zoning change, the CPC is required to give public notice and hold a hearing affording interested persons an opportunity to be heard on any such proposed change. *Id.* at 200.a.1. The resolution is then approved, disapproved or modified by the New York City Board of Estimate (the "Board of Estimate") within sixty days from the date the resolution is sent to the board. *Id.* at § 200.a.2 If the Board of Estimate fails to act within sixty days, the resolution is deemed approved. *Id.*

*Obtaining Approval for a Development Project*

In order to obtain approval for a development project within the City, a developer must file an application for a building permit with the Buildings Department. *See* N.Y. City Charter § 645(b)(1). The Buildings Department then either approves the permit or indicates "objections" to the permit application.

The existence of objections to a development proposal do not necessarily mean the proposal will not ultimately proceed, but rather that the objections must be resolved before a building permit is approved. Exhibit 23 to Affidavit of Peter Sudarsky, filed May 24, 1991 ("Sudarsky aff.") (deposition of Stephen B. Jacobs) ("Jacobs dep."). The objections may simply be requests for additional information, or may be more substantive, such as a requirement that certain agency approvals be obtained or that the proposed building plans be altered to conform with zoning regulations. *See* Exhibit D to Affidavit of Albert Fredericks, filed April 29, 1991 ("Fredericks aff.") at A00179–81; Jacobs dep.; Affidavit of Mario A. Fristachi, filed June 17, 1991 at ¶¶ 5–10.

If all of the Building Department's objections are successfully resolved, the department will issue a building permit and the developer can then proceed to begin construction on the project.

*The TA District*

Article 95 of the Zoning Resolution provides for the establishment of a Special Transit Land Use District (the "TA District"). The parties inform the Court that the TA District was created to accommodate the proposed Second Avenue subway line. Among the purposes of the TA District is the reduction of conflict between normal pedestrian traffic on the public sidewalks and persons attempting to gain access to the subway system. Zoning Resolution § 95–00. In furtherance of that purpose, developments within the TA District are required to provide access to the subway. *Id.*

Any new development within the TA District is required to "provide an easement on the zoning lot for subway-related use," if it is determined that such an easement is required. *Id.* at § 95–03. A developer either files an application for a transit easement certification himself, pursuant to § 95–041 of the Zoning Resolution, or is notified that a transit easement may be needed when the Buildings Department determines that a proposed development involves "ground level construction within the [TA District]," and makes an objection regarding the need for a transit easement certification on the developer's building permit application. *Id.* at 95–03. The developer must then apply to the CPC and the TA for their determination as to whether a transit easement will be required. *Id.* at § 95–04. The CPC and the TA must jointly certify their decision within sixty days after the receipt of the application.

Once the need for a transit easement has been certified, a developer must negotiate a transit easement agreement with the TA and the CPC. *Id.* at 95–041. The easement application is referred to the DCP, which determines the exact location and dimensions of the proposed easement. This determination requires the DCP to obtain detailed plans of the proposed construction from the developer, as well as to communicate with the developer concerning the required volume of the easement.

*Events Leading to the Instant Dispute*

In 1985 and 1986, plaintiffs bought eight lots consisting of buildings at 220–224 East 53rd Street and 223–233 East 52nd Street, between Second and Third Avenues in the Borough of Manhattan. The properties were located in a residential zoning district

designated as "R8" under the Zoning Resolution. This zoning classification permits a floor area ratio (i.e., the ratio of total interior floor space to the zoning lot area) ("FAR") of up to 6.5.

For the purpose of their development plans, plaintiffs merged the various parcels into a single zoning lot as permitted under § 12–10 of the Zoning Resolution. The merger allowed the plaintiffs to use the development rights of the 53rd Street portion of the property for the construction of a new building that was proposed for the 52nd Street portion of the property. Plaintiffs developed a plan to construct a 17–story building on the 52nd Street portion of the lot in place of six existing buildings, which were to be demolished. The 53rd Street buildings were to be preserved and renovated.

At the time plaintiffs were formulating their development plans, the DCP was studying a proposal to "down-zone" the area in which plaintiffs' property was located from R8 to R8B. Under R8B zoning, the maximum FAR is 4.0. This ratio was too small to permit the total floor area in plaintiffs' proposed building. Plaintiffs were aware of the existence of this proposal. Exhibit I to Fredericks aff.; Exhibit L to Fredericks aff. (deposition of Victor Marrero).

A small part of the TA District is located along East 53rd Street. According to defendants, this "spur" was created to allow for the eventual construction of a pedestrian subterranean passageway connecting the proposed Second Avenue subway and the existing Lexington–Third Avenue subway station located at 53rd Street. The 53rd Street section of plaintiffs' property was located in this section of the TA District. Although plaintiffs' proposed development was not planned for this portion of the lot, due to the fact that the lot had been merged for zoning purposes, a question arose as to whether plaintiffs' project was subject to a determination as to whether a transit easement was required.[2]

On or about December 5, 1986, plaintiffs filed an application and plans with the Buildings Department, requesting permission to construct a 17–story residential building on the 52nd Street portion of their property. On or about December 12, 1986, the Department of Buildings issued a series of objections to plaintiffs' application, one of which indicated that the development proposed by plaintiffs could not be approved until the CPC and the TA determined whether plaintiffs would be required to provide a transit easement on the lot. On or about December 22, 1986, plaintiffs applied to the CPC and the TA for certification as to whether or not a transit easement would be required.

Following the receipt of plaintiffs' application, a TA official wrote a letter dated January 12, 1987, advising the DCP that a transit easement was not needed for the location of Sudarsky's proposed development. A copy of this letter was sent to plaintiffs. Exhibit 7 to Sudarsky aff. This letter was superseded by a second letter from the TA, dated February 13, 1987, which stated: "upon reconsideration, the Transit Authority has determined that a transit easement is required [on plaintiffs' proposed development]." Exhibit 17 to Sudarsky aff. Plaintiffs also received a copy of the second letter. On or about February 19, 1987, the DCP wrote to the Buildings Department, stating that CPC and the TA jointly certified that a transit easement was required on the subject zoning lot. Exhibit 20 to Sudarsky aff.

Although plaintiffs disagreed with the determination of the TA and CPC that a transit easement was needed, they did not seek review of the decision by the Board of Standards and Appeals as permitted by the Zoning Resolution. Instead, following certification of the easement requirement, plaintiffs submitted a draft of the easement conveyance agreement and certain

**2.** It is undisputed that Sudarsky's attorney as well as his project manager were of the opinion that he was required to file an application for a transit easement certification for his project.

Exhibit J to Fredericks aff.; Exhibit M to Reply Affidavit of Albert Fredericks, filed June 17, 1991 (deposition of John S. Grupp) at 76.

other documentation to the DCP and the TA on or about May 5, 1987. Exhibit L to Affirmation of Mario A. Fristachi, filed April 29, 1991. Plaintiffs and the DCP never exchanged the information necessary to determine the exact dimensions of the easement. The parties disagree as to who is responsible for this failure of communication.

In October 1987, the New York City Board of Estimate approved an amendment to the Zoning Resolution, by which the area surrounding plaintiffs' property was downzoned from R8 to R8B. As pointed out above, the 17–story building proposed by plaintiffs was no longer permitted under the new classification. In 1988, plaintiffs sold the property for approximately $12,-000,000. The DCP thereafter formally terminated the application for easement certification.

Plaintiffs initiated the instant lawsuit on July 28, 1989 and subsequently amended their complaint on September 26, 1990. The Amended Complaint alleges that the DCP and CPC, in furtherance of a City policy of discouraging mid-block real estate development in east midtown, adopted a plan designed to prevent plaintiffs' development project, by illegal or unconstitutional means if necessary. According to the Amended Complaint, pursuant to this plan, the DCP determined that it would claim a transit easement through plaintiffs' proposed development site, delay the City's action on such easement administratively and delay issuance of plaintiffs' building permit, until such time as the area including the site had been down-zoned so as to make plaintiffs' proposed development illegal. Plaintiffs claim that defendants' actions violated their rights to substantive and procedural due process and equal protection of the laws and amounted to an unconstitutional taking, in addition to violating their rights under the New York State constitution. The complaint seeks compensatory damages in the amount of $26,000,000, for losses plaintiffs claim they sustained on their investment as well as for lost profits had the project gone forward as planned. Plaintiffs also seek reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Following the completion of discovery, defendants moved for summary judgment, claiming that they are entitled to judgment as a matter of law, or alternatively, that the evidence produced in discovery reveals that they acted legally at all times. Plaintiff subsequently cross-moved for partial summary judgment on the question of liability.

## DISCUSSION

The standards for granting summary judgment in this Circuit are well-established. A court may grant this extraordinary remedy only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). Only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National Railroad Passenger Corp. v. City of New York*, 882 F.2d 710 (2d Cir.1989).

While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.* 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a

court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra,* 804 F.2d at 12. The motion then:

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Pro. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

### A. The Substantive Due Process Claims

■ In order to state a substantive due process claim, a party must first establish that he had a valid "property interest" in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit. *Brady v. Town of Colchester,* 863 F.2d 205, 211–12 (2d Cir.1988) (citing *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972)). Since property interests are not created by the Constitution, federal courts must look instead to "existing rules or understandings that stem from ... state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits" in deciding whether such a property interest existed. *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

In the context of a due process claim involving the failure of a state administrative agency to issue a permit, this circuit uses an entitlement analysis to determine whether a party's interest in the permit's issuance is protectible under the Fourteenth Amendment. *See Natale v. Town of Ridgefield,* 927 F.2d 101, 105 (2d Cir. 1991); *Greene v. Town of Blooming Grove,* 879 F.2d 1061, 1065 (2d Cir.1989). The entitlement test was first articulated by the Court of Appeals in *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985):

> [T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment.

The analysis thus focuses on the extent to which the issuing authority may exercise its discretion in arriving at a decision rather than on an estimate of the probability that the authority will make a specific decision. *RRI Realty Corp. v. Inc. Village of Southampton,* 870 F.2d 911, 918 (2nd Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989).

■ In the present case, plaintiffs claim that defendants' actions violated their substantive due process rights by denying them the opportunity to develop the subject zoning lot as of right. According to plaintiffs, the request for an easement by the CPC and the TA was not authorized by the Zoning Resolution, which, they maintain, requires a transit easement only when a development is physically within the TA District. Since plaintiffs' development was to take place on that part of the zoning lot lying outside the TA District, plaintiffs argue that their development should never have been subject to a determination as to whether an easement was necessary.[3]

---

**3.** Plaintiffs also argue that the request was illegal because they claim that the Zoning Resolution does not provide for the specific type of easement requested in this case. According to plaintiffs, the Zoning Resolution only provides for six different types of easement. Zoning Resolution, § 95–031, Tables A and B to Art. IX. All of the easements described in the Zoning

Plaintiffs contend that the City subsequently delayed a final easement agreement until the resolution effecting the down-zoning was passed.

■ If plaintiffs had obtained a building permit and succeeded in completing a substantial portion of the construction of their development, their right to complete the project would have vested at the time the down-zoning was effected. Under New York law, an owner is permitted to complete a development which has been rendered nonconforming by the passage of a more restrictive zoning ordinance if the owner has "undertaken substantial construction and made substantial expenditures prior to the effective date of the [new ordinance]." [4] *Ellington Construction Corp. v. Zoning Board of Appeals of the Inc. Village of New Hempstead,* 77 N.Y.2d 114, 564 N.Y.S.2d 1001, 1005, 566 N.E.2d 128, 132 (1990).

Although plaintiffs' claims concern the complex regulatory framework created by New York's zoning regulations as well as the somewhat byzantine interrelationship of the various City agencies charged with developing and implementing City planning policy, plaintiffs' position may be summarized fairly succinctly: but for the unauthorized conduct of the CPC and the TA, plaintiffs would have received a building permit in time to obtain a vested right to complete the development project prior to the down-zoning. This contention is insufficient to establish plaintiffs' possession of a property interest protected by the Fourteenth Amendment.

Plaintiffs point to § 77–02 of the Zoning Resolution in support of their position that they should never have been subject to an inquiry as to whether a transit easement was required on their development and the inherent delays that such an inquiry entails. Section 77–02 provides:

**Zoning Lots Not Existing Prior to Effective Date or Amendment of Resolution**

Subject to the provisions of Section 77–04 and Section 77–221 whenever a *zoning lot* is divided by a boundary between two or more districts and such *zoning lot* did not exist on December 15, 1961 or any applicable subsequent amendment thereto, each portion of such *zoning lot* shall be regulated by all the provisions applicable to the district in which such portion of the *zoning lot* is located.

(Emphasis in original.) Plaintiffs contend that § 77–02 applied to their development because the zoning lot on which their property was located was created when the lot was merged in preparation for the development proposal. According to plaintiffs, the plain language of § 77–02 shows that no transit easement could be required for their development, which was located entirely outside the TA District. Defendants dispute plaintiffs' interpretation and point to other provisions of the Zoning Resolution which they contend demonstrate that plaintiffs' development was properly subject to a determination as to whether a transit easement was required.

Even assuming that defendants misinterpreted the Zoning Resolution and that

---

Resolution are designed to provide for exits from the subway to the ground level, or vice versa. The descriptions of those easements consist primarily of dimensions allowable for staircases and escalators. A subterranean tunnel, the easement requested by the CPC and the TA, is not one of the six described in § 95–031.

Plaintiffs' reading of § 95–031 is far too narrow. Section 95–031 states that Tables A and B list "possible types" of transit easements, rather than an exhaustive list of every type of easement that may be required. Moreover, § 95–03 lists several reasons for requiring an easement, including: "[t]he integration and relating of subway station design to surrounding development, ... the reduction of conflict between pedestrian movements and station facilities on the

street level," and "the relation of subway entrances to commercial and other transit facilities." A tunnel-type easement would further all of these objectives. It would be anomalous to read the Zoning Resolution, which provides that the purposes of the TA District include "provid[ing] access to underground transit or other subway amenities" and "encouraging the provision of adequate underground pedestrian circulation systems," as limiting all transit easements to exit/entrance facilities and specifically excluding an underground tunnel. *Id.* at § 95–00.

**4.** The parties agree that completion of the foundation for the building would have satisfied this requirement.

plaintiffs' permit application was therefore subject to unnecessary delay, any such delay cannot be said to have caused plaintiffs' failure to complete their development project. The down-zoning which made plaintiffs' proposed project unfeasible could have occurred at any time during the period in which plaintiffs sought approval for their project, regardless of how quickly plaintiffs' application was processed.

The City Charter states explicitly that the CPC may propose changes to zoning regulations "upon its own initiative at any time." N.Y. City Charter § 200.a.1. The Board of Estimate may then approve the change at any time during the following sixty days. *Id.* at § 200.a.2. Since the CPC was free to submit the down-zoning proposal to the Board of Estimate at any time, it can hardly be said that absent the delay in the approval process occasioned by the Buildings Department's alleged misinterpretation of the Zoning Resolution, there was "a certainty or a very strong likelihood," *Yale Auto Parts, Inc. v. Johnson, supra,* 758 F.2d at 59, that plaintiffs' application would be approved in time for their rights to vest prior to the down-zoning.

■ Both plaintiffs and defendants have made voluminous submissions concerning the likelihood that, if an easement had not been required, plaintiffs could have completed sufficient construction on their development to vest their rights prior to the down-zoning. As pointed out above, however, the entitlement test centers not on the estimated probability of a favorable outcome, but on the degree of discretion enjoyed by the issuing authority.

Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest.

*RRI Realty Corp. v. Inc. Village of Southampton, supra,* 870 F.2d at 918. Therefore, although agents of plaintiffs and defendants gave various assessments of the length of time necessary for plaintiffs to acquire vested rights to complete the project, and expressed differing opinions as to when the down-zoning was likely to be enacted, the correct focus for the Court's inquiry is whether the timing of the down-zoning was discretionary. Plaintiffs may sincerely believe that they would have been able to complete their development project if a transit easement had not been required of them. However, because the timing of the down-zoning was within the discretion of the CPC, plaintiffs have failed to establish the existence of a constitutionally protected property interest.

■ Moreover, even if plaintiffs were able to demonstrate that they had a property interest in the issuance of the building permit prior to the down-zoning, their substantive due process claim would fail. In cases involving zoning disputes, substantive due process entitles property owners to be free from arbitrary or irrational action. *Brady v. Town of Colchester, supra,* 863 F.2d at 215. None of the evidence submitted by plaintiffs suggests that defendants' actions were in any way arbitrary or irrational. Plaintiffs do not allege that the down-zoning proposal was designed with the aim of blocking their development project. In fact, they could not make such a claim, since their own advisors informed them that a down-zoning of the area in which their property was located was under study prior to the time they applied to the City for approval of their project. *See* Exhibit I to Fredericks aff.

In addition, while it is possible that defendants misinterpreted the Zoning Resolution in applying the TA District regulations to plaintiffs' development, there is no indication that any such misinterpretation was made other than in good faith. Indeed, it is undisputed that at the time plaintiffs applied to the CPC and the TA for certification as to whether or not a transit easement would be required, plaintiffs also believed that their development was subject to such certification. Plaintiffs have submitted numerous internal memoranda as well as deposition testimony of employees of the City and the TA in an attempt to show that defendants acted deliberately to prevent plaintiffs' proposed development.

However, as described more fully below, in the discussion of plaintiffs' equal protection claim, what these documents reveal is nothing more than City and transit officials lawfully attempting to discharge their responsibilities.

■ Plaintiffs had no vested right to the existing zoning classification of their property. *See Ellentuck v. Klein,* 570 F.2d 414, 429 (2d Cir.1978) (citing *Shepard v. Skaneateles,* 300 N.Y. 115, 89 N.E.2d 619 (1949)). Nor did plaintiffs satisfy New York's requirements for obtaining a vested right to complete their development. Plaintiffs' substantive due process claim amounts to an attempt to manufacture an entitlement from a unilateral expectancy that their project could be approved and vested within a specific period of time and accordingly must be rejected.

### B. *The Procedural Due Process Claims*

Plaintiffs cite several aspects of the transit easement certification process which they claim violated their right to procedural due process.

#### 1. *Facial Challenge to the Zoning Resolution*

Plaintiffs first claim that the Zoning Resolution is unconstitutional on its face because it does not provide for a hearing prior to the time that a transit easement is certified. Contrary to plaintiffs' assertions, however, such a hearing is available. While the Zoning Resolution does not provide for a hearing before the TA and the CPC, an administrative appeal may be taken from the Buildings Department's determination that a transit easement certification is required for a specific development site.

Section 645(b) of the New York City Charter, which grants the Buildings Department exclusive power to approve or disapprove plans for the construction of buildings within the City, provides that this power is "subject to review ... by the board of standards and appeals." In addition, the Zoning Resolution provides in § 72–01(a) that the Board of Standards and Appeals has the power "to hear and decide appeals from and to review interpretations of this resolution." After an unsatisfactory final decision by the Board of Standards and Appeals, a party may institute proceedings pursuant to Article 78, N.Y.Civ.Prac.L. & R. ("Article 78"), in state court.

Plaintiffs complain that they were deprived of an opportunity to attempt to persuade the City that no easement could be required prior to the time that the need for an easement was certified. However, plaintiffs could have brought about a hearing concerning that question by appealing the Buildings Department's determination that the proposed development was subject to an easement certification at the time the Buildings Department made its objection to plaintiffs' building permit application. "Where a plaintiff has an opportunity to contest a defendant's action and fails to do so, there is no violation of due process rights or of § 1983." *Tall v. Town of Cortlandt,* 709 F.Supp. 401, 408 (S.D.N.Y.1989).

#### 2. *Procedural Defects in the CPC's Decision–Making*

■ Plaintiffs next contend that their due process rights were violated because, they maintain, the CPC failed to follow its own procedures in arriving at a decision that a transit easement was required.[5] However, plaintiffs have no constitutional right to require the CPC to follow its internal rules. Federal constitutional standards rather than state rules define the requirements of procedural due process. *Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987) (citing *Cleveland Board of Education v.*

---

**5.** According to plaintiffs, the CPC's rules required that certification of the transit easement take place at a meeting of the commission. While plaintiff's easement certification was placed on the agenda of a CPC meeting, the minutes of that meeting do not reflect that the matter was ever resolved. However, Marcelyn Anhouse, an employee of the CPC, testified that she was instructed to prepare a letter documenting that a transit easement was required, and that this was the usual procedure when the commission had agreed to certify a zoning matter. Exhibit 21 to Sudarsky aff. (deposition of Marcelyn Anhouse) at 16.

*Loudermill*, 470 U.S. 532, 540–41, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985)).

■ Section 95–041 of the Zoning Resolution provides that the decision as to whether a transit easement is required is within the discretion of the CPC and the TA. "[I]f state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection." *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201–1202 (2nd Cir.1987). When official action is discretionary, the official decision-making process is insulated from procedural due process attacks, even when the officials involved have engaged in egregious and politically-influenced procedural irregularities. *Yale Auto Parts, Inc. v. Johnson, supra,* 758 F.2d at 58. Therefore, the minor deviations from CPC internal rules alleged by plaintiffs are insufficient to state a claim that their procedural due process rights were violated.

### 3. *The TA's Reconsideration of the Easement Question*

■ Plaintiffs' final contention regarding their procedural due process claim concerns the two letters sent by the TA to the DCP, stating first that no easement was needed on plaintiffs' development site, and later that an easement was in fact required. Plaintiffs claim that the TA was not entitled to reconsider its determination that no transit easement was required. Plaintiffs point out that the Zoning Resolution nowhere provides that a zoning decision may be revoked. Defendants argue

that the letters do not constitute a determination of the easement issue, which could only be made jointly with the CPC, but are instead merely an expression of views as to whether an easement was needed.

■ The Court agrees with defendants that the TA's letters could not constitute a resolution of plaintiffs' easement certification. Section 95–041 of the Zoning Resolution specifies that "the Transit Authority and the City Planning Commission shall jointly certify whether or not an easement is required." [6] Therefore, a statement by the TA alone that an easement was not required, whether characterized as a "determination" or an "expression of views" did not constitute a decision on which plaintiffs were entitled to rely. In addition, even if the TA's original letter could be seen as a type of interim decision of the easement question, an agency is permitted to reconsider its interim or even its final decisions, whether or not the applicable statute and regulations provide for such review, as the Court of Appeals for this circuit has recently made clear.[7]

### C. *The Taking Claim*

Plaintiffs contend that defendants' actions constituted a taking for which just compensation is due under the Fifth and Fourteenth Amendments. This claim is based on two arguments: first, that defendants placed an impermissible condition on plaintiffs' building permit by requiring the conveyance of the transit easement; and second, that by refusing to issue the building permit until the easement was conveyed, defendants effected a temporary

---

6. Any defects in the decision-making process of the CPC and the TA could have been appealed to the Board of Standards and Appeals and eventually challenged in an Article 78 proceeding in state court, as plaintiffs acknowledge.

7. The Court of Appeals indicated that ordinarily an agency should only undertake a reconsideration of a decision within a reasonable time and should afford the claimant proper notice of its intent to reconsider the decision. *The Dun & Bradstreet Foundation v. United States Postal Service,* 946 F.2d 189, 193 (2d Cir.1991). Here, the second letter containing the TA's new determination that an easement was required was dated February 13, 1987, approximately one

month later than the first letter, which was dated January 12, 1987. The time elapsed between the two letters is not unreasonable, and the reconsideration took place within the sixty day period during which the CPC and TA were entitled to consider transit easement applications. *See* Zoning Resolution § 95–041. While plaintiffs were never notified that the TA was reconsidering its decision, since the transit easement determination is discretionary, plaintiffs had no federally protected interest entitling them to procedural due process protections regarding that decision. *RR Village Ass'n, Inc. v. Denver Sewer Corp., supra,* 826 F.2d at 1201–1202.

regulatory taking, which became permanent when the down-zoning was approved.

### 1. *Easement Determination as a Prior Condition to Approval of a Building Permit*

■ The first theory plaintiffs advance in support of their takings claim is that the transit easement provisions of the Zoning Resolution run afoul of the requirement of *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 836–37, 107 S.Ct. 3141, 3148–49, 97 L.Ed.2d 677 (1987), that a condition placed on a permit must substantially further a governmental purpose that would justify denial of the permit.

In *Nollan*, a property owner challenged a law requiring the conveyance of an easement across the owner's property as a prior condition to issuance of a permit allowing him to replace his beachfront bungalow with a three bedroom house. The state required the easement on the ground that the larger house would block the view of the beach from the street, thereby creating a "psychological barrier" to using the beach. *Id.* at 838, 107 S.Ct. at 3149. The Supreme Court held that while the state was entitled to prohibit a larger house entirely in order to protect the view of the beach, imposing the condition of an easement across the owners' property constituted a taking, because it "utterly fail[ed] to further the end advanced as the justification for the prohibition." *Id.* at 837, 107 S.Ct. at 3148.

Here, the Zoning Resolution provides that among the purposes of the TA District are "[t]o minimize the conflict between normal pedestrian movements on public sidewalks and access to underground transit systems;" and "[t]o reduce congestion on city streets in the vicinity of transportation nodes." Zoning Resolution § 95–00. While plaintiffs' arguments on this point are not entirely clear, they apparently do not take issue with the notion that the City could prohibit new development in the area of the proposed Second Avenue subway in order to prevent street and sidewalk congestion and overburdening of subway facilities. Plaintiffs focus instead on the contention that defendants' proffered explanation for the easement falls short of the nexus condition outlined in *Nollan*. According to plaintiffs, defendants were obliged to undertake an individualized inquiry such as an environmental impact study to determine whether plaintiffs' proposed development would have any effect on street congestion or subway use.

■ Although the easement requirement, as applied to plaintiffs' proposed development, must substantially advance legitimate interests of the City, the federal constitution does not require the City to undertake the type of detailed study that plaintiffs argue is necessary. The nexus between higher population density occasioned by new development and increased use of public facilities has long been recognized as sufficient to justify the transfer of a portion of developers' property to public use to help alleviate the additional burden placed on public services. For example, *Jenad, Inc. v. Village of Scarsdale*, 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673 (1966), cited approvingly in *Nollan v. California Coastal Comm'n, supra*, 483 U.S. at 840, 107 S.Ct. at 3150, upheld a condition to the approval of subdivision plats requiring the subdivider to allot some land within his subdivision for park purposes or pay a fee to the village. The court found the condition to be justified by the fact that the creation of new subdivisions increased the demand for more recreational space in the community. *Jenad, Inc. v. Village of Scarsdale, supra*, 271 N.Y.S.2d at 958, 218 N.E.2d at 675.

According to the affidavit of William Valletta, general counsel to the DCP, the development proposed by plaintiffs—a 17-story building containing 153 apartments, a community facility and a restaurant—would have had precisely the type of impact that the TA District was designed to mitigate. Affidavit of William Valletta, filed June 17, 1991 at ¶ 13. Because this determination is sufficient to satisfy the nexus requirement of *Nollan*, plaintiffs' first argument in support of their takings claim must be rejected.

## 2. *The Regulatory Takings Claim*

■ The second of plaintiffs' takings theories is that plaintiffs were subject to a regulatory taking through the combined effects of the delay caused by the easement requirement and the subsequent down-zoning. In order to succeed on a regulatory takings claim, a plaintiff must establish first that the regulation in question "goes too far," *see, e.g., Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)), and in substance effects a taking of his property. Second, a plaintiff must show that "any proffered compensation is not 'just.'" *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986).

■ According to plaintiffs, at the time of the joint certification of the TA and CPC requiring an easement, the brownstones standing on their development site had been vacated and the utilities disconnected in anticipation of the commencement of construction. Because no building permit could issue until a final easement agreement was reached, plaintiffs argue that they were deprived of all use of their property during the easement negotiations. This temporary deprivation became permanent, they contend, when the down-zoning was put into place and plaintiffs' proposed project became unfeasible.

The Supreme Court has repeatedly held that a regulatory takings claim is not ripe until the government "entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Regional Planning Comm'n v. Hamilton Bank, supra*, 473 U.S. at 186, 105 S.Ct. at 3116; *see also MacDonald, Sommer & Frates v. County of Yolo, supra*, 477 U.S. at 348, 106 S.Ct. at 2565. The focus of a regulatory takings claim is the economic impact of the regulation and the extent to which it interferes with reasonable investment-backed expec-

tations. *Id.* at 191, 105 S.Ct. at 3118. Because these factors cannot be properly evaluated until the administrative agency has arrived at a final position as to how it will apply its regulations to the property in question, a plaintiff is required to obtain "a final and authoritative determination of the type and intensity of development legally permitted on the subject property" prior to pursuing a regulatory takings claim in federal court. *MacDonald, Sommer & Frates v. County of Yolo, supra*, 477 U.S. at 348, 106 S.Ct. at 2566.

Plaintiffs argue that the ripeness doctrine does not bar a decision on the merits of their regulatory takings claim, because the determination that a transit easement would be required on their property was a final administrative determination. However, plaintiffs' regulatory takings claim does not concern the requirement that an easement be conveyed, but rather the delay that such a requirement entailed, as well as the effect of the subsequent down-zoning on plaintiffs' development plans. This claim amounts to a contention that defendants' actions made plaintiffs' original development plan impossible.

■ Since the evaluation of a regulatory takings claim involves a factual inquiry into the particular circumstances of each case, *MacDonald, Sommer & Frates v. County of Yolo, supra*, 477 U.S. at 349, 106 S.Ct. at 2566, the rejection of a single development plan is not sufficient to demonstrate that a regulatory takings claim is ripe for decision. *Id.* at 351–53, 106 S.Ct. at 2567–68; *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 136–37, 98 S.Ct. 2646, 2665–66, 57 L.Ed.2d 631 (1978). Thus, while plaintiffs were not required to exhaust their state administrative remedies by appealing the Buildings Department's decision that the TA District regulations applied to their proposed development, *see Patsy v. Bd. of Regents of the State of Florida*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982), they were required to obtain a conclusive determination as to what type of development would be allowed on their property, for example by applying for a variance

from the lower FAR put into effect by the down-zoning. Plaintiffs made no such effort, and may not now pursue a regulatory takings claim in federal court.

■ Moreover, plaintiffs made no attempt to seek compensation from the state for the taking they allegedly suffered. A court cannot determine whether state has provided a property owner with "just compensation" for property which has been taken until the amount of compensation the state intends to provide is known. *MacDonald, Sommer & Frates v. County of Yolo, supra,* 477 U.S. at 350, 106 S.Ct. at 2566. Thus, the Supreme Court has repeatedly indicated that if a state provides an adequate procedure for seeking just compensation, a property owner cannot bring a takings claim in federal court until it has used the state procedure and been denied just compensation. *Id.; Williamson County Regional Planning Comm'n v. Hamilton Bank, supra,* 473 U.S. at 195, 105 S.Ct. at 3121; *see also Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990). Under New York law, a compensable *de facto* taking may be established by showing "a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property." *City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 357, 269 N.E.2d 895, 903 (1971). Plaintiffs did not make use of the state court system in order to obtain compensation for their alleged taking, and thus their takings claim is unripe for this reason as well.

Because the easement requirement satisfies the test announced in *Nollan,* and because any regulatory takings claim plaintiffs may have is not ripe for adjudication, defendants are entitled to summary judgment with respect to plaintiffs' takings claim.

### D. *The Equal Protection Claim*

■ Plaintiffs claim that their equal protection rights were violated because they were unlawfully required to provide a transit easement while other similarly situated developers were not. A plaintiff may establish an equal protection claim by demonstrating that a governmental authority has "not only ... deliberately interpret[ed] a statute against a plaintiff, but also ... singl[ed] him out alone for that misinterpretation." *Brady v. Town of Colchester, supra,* 863 F.2d at 216 (quoting *Burt v. City of New York,* 156 F.2d 791, 792 (2d Cir.1946)).

In the instant case, plaintiffs claim that defendants deliberately misinterpreted the Zoning Resolution to subject plaintiffs' development to the TA District regulations, and then demanded an easement of plaintiffs, when other developments in the same neighborhood were not required to convey an easement to the City. Defendants argue that the evidence plaintiffs have submitted in support of their equal protection claim is insufficient to withstand a motion for summary judgment.

■ In order to survive a motion for summary judgment, plaintiffs need not show that they will prevail on the substance of their claims, but only that the evidence they have presented raises material factual issues which must be resolved by the trier of fact. *Knight v. U.S. Fire Ins. Co., supra,* 804 F.2d at 11. The Court's inquiry thus becomes whether, taking plaintiffs' submissions into account, their case remains "devoid of any significant probative evidence that would tend to support the complaint." *Ambook Enterprises v. Time Inc.,* 612 F.2d 604, 611 (2d Cir. 1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980) (citation omitted).

In their arguments regarding their equal protection claim, plaintiffs cite no evidence tending to show that they were the victims of a deliberate plan to misinterpret the Zoning Resolution in order to stop their proposed project. Instead, plaintiffs simply affirm the correctness of their interpretation of the Zoning Resolution, then baldly assert that defendants deliberately misinterpreted the Zoning Resolution against them. Plaintiffs' failure to put forward any evidence on this point would justify the entry of summary judgment against them.

However, because the Court is required to draw all inferences in favor of plaintiffs in deciding defendants' summary judgment motion, the Court will first consider whether any of the evidence contained in plaintiffs' submissions could support their equal protection theory.

Plaintiffs have submitted evidence concerning a series of events which could support their claim that they were singled out for unequal treatment. This evidence relates to communications that took place between Community Board 6 (the "Community Board") the MTA and the TA. The Community Board, which plaintiffs characterize as "a hotbed of neighborhood opposition" to development, Plaintiffs' Memorandum of Law, filed May 24, 1991, at 6, was informed of plaintiffs' application for a transit easement certification by letter dated February 2, 1987. Exhibit 8 to Sudarsky aff. (letter from the DCP to Community Board Number 6). Plaintiffs have submitted a resolution of the Community Board stating its position that a high-rise building such as plaintiffs' proposed development was inappropriate for plaintiffs' site.[8] Exhibit 9 to Sudarsky aff.

Soon after learning of plaintiffs' application, Brenda Levin ("Levin"), the Chairperson of the Community Board's Land Use Committee, telephoned Donald Bloomfield ("Bloomfield"), a lawyer and planner with the MTA.[9] See Exhibits 12 and 13 to Sudarsky aff. (depositions of Brenda Levin ("Levin dep.") and Donald Bloomfield ("Bloomfield dep.")). According to the depositions of Levin and Bloomfield, Levin asked Bloomfield whether the TA had turned down the opportunity to ask for an easement on plaintiffs' development, and whether this was standard operating procedure. Levin dep. at 78; Bloomfield dep. at 34. Bloomfield subsequently communicated with the TA and determined that a letter had been sent stating that an easement was not required. Following Bloomfield's

communication with the TA, the TA issued the second letter in which it stated that a transit easement was required.

The communications between the Community Board, the MTA and the TA do not reveal any intention to purposely misinterpret the Zoning Resolution in order to stop plaintiffs' project. Community boards are authorized by the New York City Charter to act in an advisory capacity regarding land use. N.Y. City Charter § 2800.a. Section 95–041 of the Zoning Resolutions requires that the affected community board be notified of any application for a transit easement certification. The Community Board was thus properly informed of the pendency of plaintiffs' request for a determination regarding a transit easement, and did no more than it was entitled to, that is, express its view on a land use matter within its jurisdiction. N.Y. City Charter § 2800.d(2). While plaintiffs have submitted some evidence that the Community Board was opposed to plaintiffs' development proposal, plaintiffs must be able to identify some evidence of purposeful misuse of the law in order to avoid summary judgment on their equal protection claim.

A second incident cited by plaintiffs is a conversation which took place between Bloomfield and Jonathan A. Lindsey ("Lindsey"), who was at the time an attorney with the CPC. See Exhibits 39 and 40 to Supplemental Affidavit of Peter Sudarsky, filed June 25, 1991 ("Supp. Sudarsky aff."). The conversation took place on December 23, 1986, which plaintiffs point out is the day after their application for an easement certification was filed. In the conversation, Bloomfield told Lindsey that he believed an easement should be required for plaintiffs' site. Exhibit 40 to Supp. Sudarsky aff. (deposition of Jonathan A. Lindsey) at 42. Bloomfield also indicated that an easement should have been required at 875 Third Avenue, the lot adjacent to plaintiffs' property, but that the

---

**8.** It appears that the Community Board was not entirely aware of plaintiffs' development plans, since the resolution states that plaintiffs had "indicated a possibility of building a 15–to–17 story apartment hotel or apartment building." Exhibit 9 to Sudarsky aff.

**9.** Bloomfield acted as liaison between City agencies and MTA-affiliated agencies such as the TA. Affidavit of Donald Bloomfield, filed April 29, 1991 at ¶ 5.

City had failed to obtain one. *Id.* at 43. Bloomfield stated that an easement had been taken at 885 Third Avenue, across the street from plaintiffs' property. He felt an easement should be required on plaintiffs' lot "just in case." *Id.* at 45. There was evidently some confusion as to whose responsibility it was to decide the matter. Lindsey's notes, memorializing the conversation, state: "Q for us: Who decides? DOB? CPC? TA?" Exhibit 39 to Supp. Sudarsky aff. Bloomfield stated that he would tell plaintiffs that the TA would wait for the CPC to decide the matter.

According to plaintiffs, the conversation between Bloomfield and Lindsey demonstrates that Bloomfield and Lindsey purposely delayed the easement decision in order to "kill" plaintiffs' project. However, nothing in the evidence submitted by plaintiffs shows any intent on the part of Bloomfield or Lindsey to delay or stop plaintiffs' project. Nor does the conversation show any deliberate misuse of the zoning regulations. Instead, Bloomfield and Lindsey appear to have simply had a discussion as to whether a transit easement was needed on plaintiffs' lot, exactly the type of conversation contemplated by § 95–041 of the Zoning Resolution. Moreover, the conversation undermines any inference that the Community Board's opposition to plaintiffs' development proposal was behind the demand for the transit easement, since the conversation between Bloomfield and Lindsey took place over a month before the Community Board communicated with Bloomfield.

None of the evidence put forward by plaintiffs, when examined in the most favorable light, presents genuine factual issue on their equal protection claim. There is simply no evidence that anyone working for the City deliberately misinterpreted or misused the Zoning Resolution. Accordingly, defendants are entitled to summary judgment on plaintiffs' equal protection claim.

E. *The Pendent State Law Claims*

Plaintiffs have brought several claims under the New York State Constitution which parallel their federal claims. In light of the dismissal of plaintiffs' federal claims, dismissal of the pendent claims is appropriate as well. "It is well settled that if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)); *see also* 28 U.S.C. § 1367(c)(3). Accordingly, plaintiffs' state law claims are dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiffs' cross-motion for partial summary judgment is denied.

Settle judgment on notice.